The next case is number 2011-1461, In Re Applied Materials, Mr. Draxler. Thank you, Your Honor.  The board in this appeal made three fundamental errors. Each one of those errors has a common thread, but each one of them independently provides a basis for reversal. The common thread is a failure of the board to explain the reasoning behind its conclusions on the three different issues. The first issue, teaching away, the board simply said that the prior art reference distinguished on only the distinction between perforations and grooves, but completely ignored the language that said the grooves were shallower. On results-effective variables, the board and the solicitor both failed to identify a result that these variables are effective for. They agglomerate them all into one optimizing result, or they variously refer to polishing rate, polishing uniformity, life of the pad, but that's not an appropriate analysis for results-effective variables. And on commercial success, and this is an issue that does not take a backseat in this case, because the evidence that applied materials put together made a perfect apples-to-apples comparison, which is what this court requires. The board actually used that apples-to-apples comparison against us, and in a way that we don't fully understand, decided that it was improper to use the best-known methods which were available for both of the competing pads, and as a way to distinguish our pad that was more successful. What's the nature of the so-called warranty arrangement? It's not a tie-in, right? I mean, this is the notion that if you've got the machine, it's preferable, or if there's some sort of a warranty of performance, you better use this pad. Right. Okay. So the BKM, the best-known methods, it's an indication that says if you use pads that have BKM, best-known methods, we will back our machine. It's a warranty of, if you go out and get something that's not out there, you're somewhat on your own. What do you mean to say, back our machine? I mean, is it a warranty that works better? I was unclear, because I didn't have the terms, or maybe I didn't see it in the brief, I didn't see the terms of the contract. Right. You buy one of these machines, right? Or you rent the machine, and then you have the pads wear out, so you have to put pads on from time to time. Now, if somebody said, well, you know, when you buy a machine, you're required, I'm sure they wouldn't do that, because it's against the antitrust law. Right. If they had said that you're required to use my pad, then the fact that the pad is very successful wouldn't be easily explained. So what I was worried was that there was something in the nature of a, it's not, I'm not saying that the client was engaged in antitrust behavior, but something that sort of was a whiff of the same thing, so that the person that buys the machine says, I don't really have a whole lot of choice. Okay. So I'll address your question, then, also why it matters. To the question, it's not a requirement. It is that the machine that applied will back the specifications, or the machine will work as it's advertised to work if you use one of the BKM pads. Okay? So you don't have to. You can use whatever you want. It's similar to, you void your warranty. So the machine will work properly if you use one of these two pads. Right. And negative, pregnant is, if you use Clevenger's pads instead, it won't. Right. Now, why that matters, though, is we're only comparing these two pads that both have BKM. There's other pads that don't have them, and you could say, well, those pads could introduce all kinds of extra factors, but they don't here, because the two pads we care about, the pad, the IC1010, which is our patented pad, and the IC1000, which is the prior pad. Nobody reasonably is going to practice anything other than the best-known method, right? That's fine. We can still win on that. It's still relevant to the case, though. Because if you decide that only BKM pads, best-known method pads, are at play, these two pads, the IC1000 and the IC1010, were on equal footing. They both had BKM. The IC1010 cost more, cost twice as much, but it only lasted. So a new improved pad. Yeah. And so we isolated out all of the other things. How do I know that the purchaser is purchasing it instead of the previous pad, which is the prior art? How do I know they're purchasing that because of some inventive benefit that's in the patent, as opposed to, well, it's a newer model. I mean, I'd rather have a newer model put out by the same people, and I'm being told that my machine may not work right unless I use it. I mean, I didn't see any evidence that ties up why one would choose the 1010 pad instead of the 1000 pad, for some reason related to what's in the patent. Okay. Fundamental to the question. The key point I need to get out of your question is, you said, I'm buying the 1010 because my machine might not work if I don't use it. The IC1000 had the exact same warranty. So as between those two pads, we backed up the IC1000 also. I understand. I understand. Either you could continue to use either one, but I mean, you've got, as I say, a newer model. I mean, my car gets me to work just as well as a brand new version of my car, but my wife might prefer that I have the brand new version for nothing having to do with patents or anything else. So I didn't see any tie that says the reason why we stopped using, why we're not using competitive pads, even though we'll violate the warranty, so to speak, we're not using the 1000 pad because of some embedded feature, some really phenomenal improvement that is involved in the 1010 pad. Okay. So two answers to that. First off, the customers would not pay twice as much if it wasn't a better pad. This isn't a car where you're trying to get something better. These are people trying to make money making chips. And we isolated, second of all, we isolated out any other factors, or at least the board did not identify any other factors. It's true, but I don't see, I don't know about the evidence that says, I mean, I'm not certain that this isn't a tiny little add-on. It's like I read the article in the paper the other day about zippers. I mean, there's a zipper monopoly that a Japanese company has, and they charge more for their than anybody else, but every manufacturer is willing to pay that extra because it comes out in the finished product as a tiny cost. So, I mean, if you take a, how much does the pad contribute to the cost of a chip? Okay. So we can have that debate, but we never had that debate below, I think, is the best answer to that one. This is administrative review. You have to review what the board held. The board just threw away the comparison between the IC1000 and the IC1010 completely. We're, you know, more than willing to have that debate, but we've never, it's never been set up below. Let's turn to the other issues. We've almost used up most of your time. So on the teaching away, I think, is the second cleanest issue. We have a statement in the prior art patent, well, first of all, let me set up perforations versus grooves. That's the difference between the prior art and the, prior to the prior art. So perforations are holes that go all the way through. Grooves are continuous. So there are two ways he could have distinguished. The picture of the prior art shows that, 779. Right. Yeah. And so he could have said, okay, there are holes that go all the way through, but they're not continuous. Or he could have said, my grooves are shallower. Well, the first statement he makes is, in comparison, grooves are much shallower, or smaller and shallower indentations on the surface of the pad. That sentence, the only distinction there is the size of the grooves. Okay. And the other statement that's been focused on the grooves is, rinsing flurry off the relatively shallow grooves. Mr. Drexler, what they're saying is, as I read that reference at 777, it's to say, you know, there's a difference between a lake and a river. And a lake, you know, can get stagnant. So the perforations are like lakes. And they say the one serious problem, it's the stuff, you know, congregates in there and then it chemically changes, and this is a terrible thing, but the great thing about our grooves is they're like a river, as you have motion, it moves. It does say that, correct? I think you can infer that from it, yeah. That's one thing you can infer. So my thought, simple-minded thought was, well, if you have a little creek with a little water running in it, and that's, you know, better for dealing with a slurry than a lake that doesn't have an action, why don't you have a bigger river? So if you increase the size of your river, aren't you going to achieve more of what this reference is trying to teach us to do with the slurry? So the problem with that is, you can infer that they're talking about the flowing river, but they never say that explicitly. They never bring out the flowing versus stagnant explicitly, but they bring out the shallower explicitly. So if anything, they more suggest the depth of the river than the flowing of the river. And it's the depth that we care about. They explicitly talk about the depth of the river. The board took that completely out and read it out of the reference. What do we do with the standard review? What a reference teaches is a question of fact, right? That's correct. And so you're arguing that there could not possibly be any substantial evidence to support treating this reference as simply distinguishing, teaching away from perforated paths. And the reason is, we're not having an argument about how a skilled artisan would take that passage. They never said a skilled artisan would read it the following way. They just conclusorily said, all it talks about, they say that in their opinion, the distinction in that reference is the lake versus river, not the depth. And that's just wrong on the face of the document. We're not having a debate about how somebody with a degree in this appropriate area would read that sentence. They just took the words out. In their second, in their rehearing opinion, they came back and said, well, it doesn't tell you, don't do deeper, right? But that requires, that's asking for an express teaching away, and Spectralytics, I believe, says you don't have to have an express teaching away from last summer. It says a teaching away can be implied. In this case, the patent office is contending that the particular dimensions and the variations in the dimensions are simply result-oriented variables. And you countered that by saying, well, but yet it produces unexpected results. What evidence of unexpected results is here? So I don't think that, I think primarily our position is that their view of what a result-oriented variable is, is wrong. Okay, if we look at In Re Antony, or Application of Antony, which we don't cite, but it's to the point that we have, and it's 559F2nd618, it says that an exception to this rule is when the result-effective variable is not recognized, the result to be achieved. And Antony also says it's wrong to just say, well, we have a lot of variables and a lot of results, and it's obvious to tweak those. That's what this case is like, is like Antony. And that's our main argument, is we've got many results. We have at least three, probably five. They focus on three of the results. There's five that were in the record. And we have three different variables. And they never say what result in particular, the width, for example. They talk about, well, depth will make it last longer. Okay, that's, I'll go with that on common sense. But what about the width? What result does increasing the width have? They say, well, it's optimization. Well, optimization is not a result. Optimization of what? And so our complaint is that they haven't identified the result. But certainly the prior art suggests that there are ranges and that there are variables and certainly suggests that there's nothing particularly critical other than the factors discussed about the flexibility and the thickness and all of that. I mean, it seems to me a fair reading of the prior art references is that there's a lot of flexibility and that a person of ordinary skill in the art will glean from the different references that, you know, different dimensions can be selected as a matter of design choice. But I think expressed at that level, that's in re-entity. That you have a lot of different things you can vary to get a lot of different goals. And that's not enough. What the patent office has to do to make out a prima facie case is identify that goal that you're reaching. They identified a goal for depth. But if you look through the record, if you look for the briefing, there's no identification of what the goal was in doubling the width. And in fact, our evidence shows that you would have been motivated away from an increase in the width because of what you said, the planarization and the flexibility issues. I'll reserve the rest of my time. Okay. Thank you, Mr. Jackson. Mr. McManus. Good morning, Your Honor. May it please the Court. Let's start with the claim. This is a claim to a basic pad that's in the art. People knew that grooves in polishing pads improve their performance. And they understood that there was a relationship between the particular dimensions recited in this claim and that performance. We know that from Welling, the primary reference, which teaches us. Those in the art were concerned with slurry distribution. People understood that improving your slurry distribution improved the performance of the machines. Welling tells us, I improved that by moving away from perforations into the grooves. After that, you see Bray-Vogel and Tillet building on that teaching and saying, got it. Let's tweak around. Let's play with the groove dimensions. Let me try sizing up. And by sizing them up, they found improved performance. Mr. Dragstead says that you've got to show that there's some goal, some reason to select certain dimensions. And none of the references indicate any reason or any basis to select the particular dimensions claim. Is that a problem? Well, two answers, Your Honor. I don't know that it's accurate because there, if you take Welling's pad, for example, he has three dimensions. He has depth. He has pitch. And he has width. And none of those dimensions match the dimensions claim. That is correct. They are all smaller. But he teaches sort of the basic composition of the groove. And then you see Tillet and Welling taking those same three dimensions and sizing them up and telling those in the art, my larger grooves improve the performance of my pad. If you look at Bray-Vogel, he says, this is at 311 to 12, paragraph 9 of the Bray-Vogel teaching. He states, his grooves, which are larger than Welling's, quote, increase the usable pad area, enable more slurry particles per area to absorb into a substrate. And he says that those characteristics, such as pitch, are optimized, quote, for the type of pad and slurry that's used to achieve high polishing rate and polishing uniformity. That goal of polishing rate, polishing uniformity, is fundamentally what everyone in the art was trying to optimize. That's what the examiner explained to apply materials. And that's what the board relied on in affirming the rejection. People in the art understood the relationship between the groove dimensions and that performance. Indeed, that's what the art was playing around with, trying to reach that optimal goal. Fundamentally, what applied materials seems to be saying is, unless the art teaches the specific causal relationship between the dimensions and the result, there can be no obviousness. But there's no requirement in the law for that. Fundamentally, that's an enablement argument at some level. And more to the point, those relationships aren't claimed. All that's claimed here are basic groove dimensions, dimensions that are in the art, dimensions that were known to the artisan, for grooves that were known to the artisan, to produce results that the artisan understood would be achieved. Perhaps emblematic or represented no better by the depth, pad life. Which, of course, post-haste, that's all we know that this actually improves upon. If you look at the Huey article that they cited in their blue brief for unexpected results, the only thing that Huey says, and indeed, the only thing their declarant says that their 1010 pad does better, is pad life. If all those changes are fungible, then you wouldn't expect any difference in results. So either you tell us that we should disbelieve customer preference and the evidence that's provided as to getting a better result, or it isn't so obviously interchangeable. If it makes a difference, and there's nothing in the prior art to say this is what you need to do to make a difference, then how can we say that it's suggestive? We might say it's a trivial difference that don't bother us. But you can't really say, can you, that there's no difference? That there's no difference between their claimed pad and the prior art? Yes. Again, this takes us in some ways also to their evidence of the secondary consideration as to whether it's viewed as better because there's customer preference or not. But accepting that there's customer preference to pay twice as much because the result is better, then doesn't one have to say that the prior art suggests that these are the in order to get an improved result? I don't think so, Your Honor, because again, we'll focus on the commercial success evidence because I think that's where Your Honor is going to. If we think about what the inference we're trying to draw from evidence of commercial success is, it's the inference that there's this gold mine waiting to be mined out there, and somebody has come along and mined it, correct? And so if it was seeming... Let's say it's a little better rather than a lot better. If it turns on that, that's a different question. We're not talking about gold mines. Okay. But to me, that's the fundamental point they're trying to make is we're making so much money. We want you to infer that people are paying money for this because what we've produced is so much better and would not have been appreciated by those in the art lest they would have done it. The problem is, as the Board explained, twofold. One, you've got that best-known methods practice, which is fundamental to undercutting the nexus between that commercial success and why people are buying it. And the problem we have... But our cases say that if the patented product is commercially successful, there is at least an inference that it's commercially successful because of what it is, unless there's some other reason which hasn't come up. Well, Your Honor, you're referring, I think, to the Demaco decision in Ormco, but that is a rule of law that applies only in the litigation context. This court's decision in N. Tri Hwang makes clear that in the ex parte prosecution context, which, of course, this is reexamination, but the same rules apply. The burden is on the patentee or the applicant to demonstrate that nexus, and the reasons are plain, as Hwang makes clear. The PTO is not in a position to produce the kind of rebuttal evidence that would be necessary if that presumption applied. Neither is the PTO in a position to say your evidence is false? Well, it's not about being false. It's about whether it goes to the ultimate inference that we're trying to draw from the commercial success. Even if you take everything that Balgani's declaration says at face value, there are still fundamental flaws in it to reach the conclusion that that evidence demonstrates non-obviousness. And this is what the board explained. We can't ignore, for example, the best-known methods practice. If you look at Balgani's declaration on that subject, which is paragraph 7 of his declaration at 5.02, one thing that needs to be explained, there's this sort of premise that the 1000 pad and the 1010 pad are on equal footing with respect to the best-known methods. But Balgani doesn't actually say that. He says that, quote, a number of BKMs are available to customers to select from to use with their particular type of machine. At paragraph 8, he says, guaranteeing the performance of their polishing pads is that one of the appropriate BKMs released by applied can be used. There's this implication that some BKMs will apply to this machine, some BKMs will apply to this machine. But it very well may be likely, based on this record, that an individual can't use the 1010 pad for his machine. There very well may be some machines for which you could use either. But fundamental to their point is that you must strip away the best-known methods practice because those two pads are on equal footing. Balgani does not say that. Even if you accept that they're on equal footing with respect to the best-known methods practice, there's still a problem on that score because Balgani makes clear that the BKM specifies more than just the pad you must use. If you look at the second sentence of paragraph 7 on 502, he says, quote, a BKM provides polishing parameters and describes consumables for use with a machine such as flurry type, revolution speed, conditioning time, polishing pad manufacturing part number, membrane pressure, retaining ring pressure, all of these things that have nothing to do with the pad. So for all we know, consumers are gravitating to a particular BKM because they like the slurry, and the pad comes along for the ride. They say, I really want to use this slurry. I'm going to use this BKM. Oh, I have to use the 1010 pad? That's fine. I could care less. That is fundamental to the nexus between why consumers are purchasing the pad and why we want to divide from that some kind of evidence of non-obviousness. Do we know what the difference in the performance is between the 1000 and the 1010? All we know... Between the prior art and the patented device? ...is what Balgani says at paragraph 10 on 503. He says it has about 1.3 to 1.6 times the lifetime. He says in the next sentence, as compared to the 1000 pad, in the next sentence, the 1010 has demonstrated superior stability and consistency, what they call wafer-to-wafer uniformity in polishing. But we know that the art suggests to us, as common sense would, that, for example, if that's our only benefit, the lifetime of the pad, which we know from the specifications derives from the depth of the grooves, that's a common sense result. The examiner explained as much. If I have a tire and I make my tread deeper, that tire will last longer. Well, if the lifetime is extended, you have to buy the replacement less frequently. That is correct. And for all we know, there's the fundamental problem... That goes to cost. It does go to cost. You might be willing to pay more for something that's going to last longer. True. And again, I think there's two considerations there, even leaving aside what I just explained in the first one, namely that that result would seemingly be self-evident to the artisan. The second problem is, that gets to the point of the market share, which was the second flaw that the board pointed out in relying on this evidence to demonstrate non-obviousness. The idea then would be, well, people, if you look at their numbers, I can see they're very large. The magnitude of the 1010 pads, 60-80% share. But of what? Not of the pad market for all machines, but simply the pad market for their machines. Even accepting that it isn't any better and nobody buys it because it's better or whatever, where in the prior art does it say that you can get whatever performance is presented here by making this kind of change? Well, for example, on the depth, the examiner found, as a matter of common sense, this is at A645, for example, the first full sentence at the top, quote, one of ordinary skill in the art would certainly expect that increasing the thickness of the pad and the size of the grooves would result in a pad having a longer service life, since it would take long for such a pad to wear down slash out. This expectation is based on the basic engineering principle that a frictional element is worn over time and by friction will last longer. So where does that teach that you should change the depth in this way as compared with what's also in the record, that the shallower depth is less likely to have stuff caught in it? On the subject of the teaching away, the board clearly understood the complete teaching. I want the teaching away. I want the teaching for. The teaching of increasing the depth? The teaching of the changes that were made in order to produce the patented item. Well, for example, if you look at. What about width? I mean, Mr. Drag said, I mean, as he said, common sense lasts longer on depth. And I didn't sound, didn't hear him to really be challenging that strongly, but he does challenge width. Well, for example, if you look at. What was the stated reason for the board as to the width? It was the overall teaching in the art. Let's remember. Be specific. I mean, we'll accept long life on depth. Okay. They refer to that. So just take width, for example, and refresh my recollection as to what did the board say, the examiner and or the board. Well, on the subject of width, and we cover in our brief roughly at pages 22 to 23, the various teachings and the rationales for why you would have adjusted the different dimensions in the prior art pads to reach the ones that they've come up with. But on the subject of width, remember, Welling teaches a width of 0.01. Applied claimed width is about 0.015. The idea here that the artisan would not have appreciated that you could adjust it by literally 0.005 doesn't bear out because, of course, the art teaches you that adjusting these dimensions up, and, of course, we have Bray-Vogel suggests, for example, a wider width, as the board found. The idea is you adjust these dimensions up and both Talay and Bray-Vogel teach that by adjusting up, you get this improved performance, this idea of improved slurry distribution, which begets improved... Oh, I seem over my time. My apologies. It gets this beget improved performance. When you look at that, when you look at the fact that the ranges are in the art, the burden shifts to them to demonstrate unexpected results, which they did not. In a scenario like that, it is the basic essence of obviousness, and the board's decision should be affirmed. If there are any other questions, I apologize for that. I just have one quick question on the... The office discounted the commercial success evidence, among other things, the fact that there were ranges, that it was imprecise. But why would that degree of imprecision render that evidence not appropriate of some sort? Well, the problem the board was explaining and the examiner explained as well was it's not so much that it was presented as a range. The problem is it's not based on any actual sales data, because, of course, law counsels that the share in the market is actually a little more probative than just sheer dollars amounts, right? So it's not the fact that it's presented in a range. The problem is, fundamentally, it's not based on any sales data, it's based on conversation, which perhaps explains why you've got... It was the unreliability of the data itself, not simply the fact that it was presented in ranges. Correct. It's not the way it was presented. They didn't say that. What they said is that you give this in 20% ranges, that's insufficient. They didn't say it's unreliable. They didn't say you're not telling us what we're entitled to know? I respectfully disagree, Your Honor. At page 29, this is the board's rehearing decision, in the last paragraph on that page, page 5, the board says, Regarding appellant's second contention that the board misapprehended and unfairly dismissed the quality of the share evidence provided by appellant, we are not persuaded. It is, quote, the fact that appellant's admission does not have exact sales information regarding the market share of the 1010 pad, highlights, underscores, the deficiencies in appellant's evidence of commercial success. Given the absence of that information, they conclude, at the bottom of that page, we decline appellant's invitation to construe the vague 20% ranges present in this record as being sufficient to define the market share. They say it's sufficient. They didn't say it's not reliable. They said it's sufficient. Deficient from the perspective of it's not based on any sales data, and so we decline the invitation to rely upon it as an accurate characterization of the actual share of your pad in this market. I'm curious. Any more questions? You suggested in the beginning, in your argument, you said, well, Wheeling comes along and then later Bragavel comes along. You're building your argument that way. It's not true, is it? I mean, I think, Bragavel comes first. Bragavel is dated 1993 and Wheeling is 1996. Oh, you're right. I apologize. I guess, date-wise, although I'm not exactly sure. You sort of made it sound like, you know, that O'Brien had been lying around and he's one up skill in the art and he's been waiting around and he sees Wheeling and then he says, oh boy, I can just make this little adjustment. Perhaps chronologically it doesn't work out that way, but I think the broader point is those in the art were playing around with the... You add up prior art in the order it comes, right? I mean, one can't benefit from prior art that hadn't happened yet. Well, I think the salient consideration is, obviously, all of this activity occurs before Applied Materials comes to ask for their patent. And it's the collective teaching of this art that speaks to the obvious in this question. But I do apologize. You're right, chronologically that isn't accurate. Okay. Any more questions? Thank you, Mr. McManus. Thank you. Mr. Drexel. Thank you. I'll go quickly in reverse order. The Breivogel teaching, I think the biggest problem with that is you didn't hear anything about width in the argument until it was pushed in the last minute. All you heard on width was Breivogel teaches a higher width. Well, no, it doesn't teach a higher width. It teaches every width. The range of Breivogel is all the way from 15 up to 500 for width. So it does not teach a higher width. That's fine. It's got a broad range. But the bottom line that you haven't heard on width is why are we going bigger? They piggyback it. They say, well, it's just like depth. We're going bigger because of slurry and so on. But if you follow Breivogel, you're going to end up... Does Breivogel teach that if you make it wider it improves performance? Nobody teaches anything about performance and width. Breivogel teaches, discusses the pitch and what effects that might have. But nobody discusses what effect the width will have on performance. On the commercial success issue, the big bottom line issue is we've got two pads that are competing against each other. The argument that you heard today about what was in that declaration or what was not, was never made by the examiner, was never made by the board. We welcomed the day that we can deal with that argument. But this is an appeal from an administrative proceeding and it's not a day to make up arguments that the board never made. They just dismissed that evidence out of hand. As far as the ranges go, if you actually read page 29 of the opinion, they did not doubt our data because it came not from actual sales or so on. Their problem was it wasn't specific and it was vague 20% range. And to pick up on a word you used, Judge Lynn, I would say that what they're doing is saying because our evidence was imprecise it must have been inaccurate. And there's a distinction between that. There's no question whether our evidence was accurate or not. And so the right result for them to do was to take the bottom end of the range or they could, I mean they can question the accuracy if they want to but they never did question the accuracy of it. They questioned its precision. They never questioned whether 40%, 50% or 60% at the bottom end of our three ranges of sales were accurate or not. And so we submit that they had no basis to question it just because we gave it a range. They decided nothing to say that ranges are inherently suspect. Our ranges are fine and they weren't questioned on their merits. So what relief are you asking for, Mr. Bryson? You want to vacate and to remand? You want to force them, force their hand to try to explain width and deal with the commercial success? We do. You know, I don't know if the word at the bottom is reverse or vacate. You're not entitled to a victory. You're not entitled to an order from us saying we reverse and tell them that your patent is not an issue. I don't think we're ever entitled. I don't think any party is ever entitled to that from the patent office. I think you send it back and they work from their rules on that. Obviously, even if you could lock them up in some way, the commissioner still can do commissioner-institute re-exams. So no, I don't think there's any way to order the grant of a patent. But we can deal with their rules on remand and we're more than happy to deal with any of the issues that were raised for the first time today on a record where we can put our case down. Our argument is that the board did not give us an opportunity to do that. The board gave conclusions. The director today has been infilling for things that were missing in the board's opinion and it's important that the board be required to state its position so that parties know what the board is acting on and know what evidence to provide. I'm trying to get at it. We've had cases in the past. I probably shouldn't mention the trash bag case with the Halloween based on it because that case didn't fare very well in the press. But that was essentially a due process case where we felt that the board hadn't adequately explained its reasoning. What I sort of hear you to be saying between the lines is that this is an apt case post-KSR to kind of blow the whistle. I think this is an N. Ray Lee. What N. Ray Lee and what Gector versus Davidson were to Zerko, this case could be to KSR. I don't think that the results are getting better. I think that the patent bar deserves to get explanations from the board. I don't think this court should be required to fill in what's missing from what the board did. What the board got in Zerko came with a responsibility. This court explained it in Gector and in Lee. And that responsibility is to explain the rationale for their holding and not to have it filled in by the solicitor's office or by the court. So we asked for a reversal and what happens on remand we'll deal with and we're more than happy to.